This action is brought by a trustee in bankruptcy to set aside a deed alleged to have been executed in fraud of defendant's creditors. The defendants, Rolland R. Gill and Charlotte Gill lived for many years upon the east half of section twenty, township one hundred and thirty-nine, range fifty-three, in Cass county, North Dakota. In 1919, they gave M.A. Baldwin a mortgage on said land to secure the payment of $10,000. In the fall of 1922 there was two years' interest due on said mortgage and taxes due against the said land. Baldwin was pressing the defendants for the payment of the interest on said mortgage. They were indebted to the First National Bank of Casselton, and in November, 1922, went to the bank to renew their indebtedness and to get an additional loan to pay Baldwin the interest on his mortgage. Morgan Ford, the plaintiff in this action and president of the bank with whom they did all of their business with said bank, renewed their notes but refused to let them have the money to pay the interest and taxes which amounted to about $2,000, but said that the directors would require a second mortgage on the land, which defendants promised to give; and, later, Ford filled out a mortgage and mailed it to defendants for execution. In the meantime, Baldwin was pressing the defendants for the interest and payment of commission. He had them come to Fargo and after they left his office he sent for the defendant J.G. Brown who is and was at the time, the father of the defendant Charlotte Gill and the father-in-law of the defendant, Rolland R. Gill, and also Rolland R. Gill's brother, and tried to interest them in the said land, but failed. On December 19, 1922, Baldwin again had the defendants in his office in Fargo and again sent for the defendant J.G. Brown, and at that time he sold the land to the said J.G. Brown. Baldwin drew the deed which was executed by the defendants, Rolland R. Gill and Charlotte Gill, Brown paying to Baldwin $1,771 interest, some back taxes, and a commission *Page 284 
note of $400. No money was paid to defendant Rolland R. Gill, nor Charlotte, but they were allowed to remain on the land, live in the house, and they, and their minor son were paid by Brown $100 per month and allowed to keep cows, chickens and pigs, and Rolland R. Gill had a life interest in an adjoining quarter section which he farmed. Deed was executed and delivered on the 19th of December, 1922, and the next day, December 20th, Rolland R. Gill wrote to Morgan Ford, as follows:
Dear Friend Morgan:
When I arrived home from Fargo yesterday I received your letter, but I had been notified by Mr. Baldwin that his company were going to start foreclosure proceedings and I had to deed the farm over to J.G. Brown for protection, that being the only thing I could do. I am certainly sorry Morgan but I was unable to help it. Hoping you will look at it in the right light, I am yours sincerely,
Rolland R. Gill.
On June 4th, 1924, Rolland Gill filed a petition in bankruptcy and the said Morgan J. Ford was appointed trustee, and in August, 1924 brought this action. He relies on the foregoing letter, and the testimony of Witness Kliegman, who testified in substance, I met the defendant Brown in the road and "I asked him what his understanding was about my ever getting my money, and he says, `I don't think so.' `Mr. Gill' he says, `is very far in debt,' and he says, `furthermore Baldwin was to foreclose him," and he says, `I know for a fact that is one of the best half sections in Cass county so I took it over so Gill wouldn't lose it.'" Plaintiff relies on the testimony of H.C. Aamoth, called on behalf of the plaintiff, which is in substance, that Brown came to the bank to see about getting a loan on this land or about selling it: "Something pertaining to the land; I can't recollect it is so long ago; but it was either about the sale or getting a renewal of a loan that was on it. . . . He went on to tell me about his son-in-law owning that land and about his son-in-law having gotten in quite deep financially and that his son-in-law had turned that land over to him so as to save something for the boy." Gill was forty-seven years old at the time, and had a boy eighteen years of age. Plaintiff also relies on the testimony of witnesses that the land was worth from $65 to $75 per acre and that *Page 285 
there was no consideration for the deed. The court made its findings and conclusions favorable to the defendants and plaintiff appeals, demanding a trial de novo. There is no merit in the claim that there was no consideration. Brown paid the interest, taxes, and a $400 commission note, all of which represented debts of the defendants and was a good and valid consideration.
There is no evidence of collusion between Gill and Brown. Gill did not go to Brown. When Gill was pressed for payment of interest he went to Ford and told Ford that Baldwin was insisting on the payment of the interest and he wanted to give a mortgage to Ford on the land for what he owed Ford's bank and an advance of enough to pay the interest and taxes. Ford would not let him have any more money but did renew his note and said that his directors would want a mortgage on the land and he would send the mortgage to him through the mail for him to execute and return. This was in November, but he did not send the mortgage until the 19th day of December, for Gill's letter dated the 20th day of December says in substance, "When I got back from Fargo yesterday, I received your letter." It is apparent that Gill never got the letter with the mortgage until after he had sold the land to Brown, and he did not sell the land to Brown until Ford had refused to advance money to Gill to pay the interest and taxes. Ford knew that Baldwin was pressing Gill for the interest, knew that the mortgage would be foreclosed if the interest was not paid, and that the land would be sold for the taxes. He knew that Baldwin had been for forty years loaning money on real estate in Cass county; that he was the owner of large tracts of land in said county and knew real estate values, and was strenuously insisting on the payment of the interest and taxes.
Plaintiff claims that he began an action against Gill immediately on receipt of Gill's letter of the 20th of December, 1922, and there is some evidence that an action was commenced and that the defendant Gill then filed a petition in bankruptcy. The petition in bankruptcy was filed June 4th, 1924, more than a year and a half after the deed was executed. Gill says he must have meant protection to himself in the letter which he wrote to Ford. Well suppose he did? He knew it was a time of depression and deflation. The bank had quit loaning money. There was no market for land. He lived on this land with *Page 286 
his family. He had cows, horses and farm machinery, all heavily mortgaged, but still in his possession. He had a homestead interest in the land, and a life interest in an adjoining quarter. He knew that the mortgage would be foreclosed if the interest was not paid and that he could not redeem from the foreclosure. He felt that he had to do something and the offer made by his father-in-law was the only offer of help that was made to him. There was nothing said at the time about his remaining on the land but if he felt, or thought, that his father-in-law would permit him to remain on the land, that would not make the conveyance fraudulent. To be fraudulent the parties at the time of the sale and conveyance must have intended to defraud Gill's creditors, and such fraudulent intent is a question of fact under § 7223, Comp. Laws 1913. In Stevens v. Meyers, 14 N.D. 398, 104 N.W. 529, this court said:
"Our statute in plain language has laid down a different rule, and, whether wise or unwise, it is our duty to apply it. Sections 5052 and 5055, so far as material, read as follows: Section 5052: "Every transfer of property . . . with intent to delay or defraud any creditor or other person of his demands, is void as against all creditors of the debtor." Section 5055: "In all cases arising under . . . the provisions of this chapter, the question of fraudulent intent is one of fact and not of law; nor can any transfer or charge be adjudged fraudulent solely on the ground that it was not made for a valuable consideration." It will be noted that § 5052 makes the fraudulent intent the vital fact which renders the conveyance void, and § 5055 declares that "the question of fraudulent intent is one of fact, and not of law," and the latter section goes further, and provides that no transfer shall be adjudged fraudulent solely upon the ground that it was not made for a valuable consideration. . . .
"The question of intent is always one of fact. It must be alleged, proved and found in order to avoid the transfer. The fact of insolvency of the grantor and the inadequacy or total want of consideration are evidences of the grantor's intent to defraud, but are not conclusive evidence. The fraudulent intent is the ultimate fact in issue. Insolvency and want of consideration are evidentiary facts, from which the fraudulent intent may be inferred. In this case the trial judge found that the conveyance was without fraudulent intent, and that *Page 287 
is the ultimate fact in issue, and the finding is conclusive. This finding is in no way affected by the presence of the additional findings as to the grantor's insolvency and the absence of consideration, for the latter, as already stated, are merely evidentiary."
If the defendant Gill intended to defraud the plaintiff he would not have gone to him first for help, he would not have written him immediately after he had deeded the land to his father-in-law, and he certainly would not have used language conveying to the plaintiff his intent to defraud, if such was his intent in the execution of the deed. So far as the record goes this letter was not answered and the action to set aside the conveyance was brought in August, 1924, more than a year and a half after the conveyance, and when it was apparent there would be a crop and a revival of real estate values. Witnesses for the plaintiff testified that the land was worth from $65 to $75 per acre, but they also said there was no market for land in 1922. There was no land sold except on foreclosure. Ford, no doubt, could have had the same deal that Brown got. Brown says he offered the land to Gunkle for what he had in it and Gunkle does not deny it, but, on the contrary, he says in substance that he thinks he had one talk with Brown about the land. He is asked if he does not remember discussing the taking over this land for the equity Brown had in it, and he answered: "I don't remember it. . . . I wasn't in the market. He may have spoken of it. . . . Q. You were not buying any land? A. No, sir. . . . Q. And there wasn't much money to buy land with at that time, was there? A. No."
Witness Aamoth says Brown came into the bank the early part of 1923 to see me about a renewal of the loan that was on this land or about selling it; . . . He said, "I can't recollect, it is so long ago; but it was either about the sale or getting a renewal of a loan that was on it; . . . that his son-in-law had turned the land over to him so as to save something for the boy." Aamoth did not buy the land nor renew the loan and neither did Gunkle, although Gill was indebted to the Gunkle bank at the time. If Brown offered to sell to Gunkle and Aamoth for what he had in it, how would that help Gill? It is clear from the evidence that 1922 was a period of great depression and deflation. There was no market for land. Baldwin, who made the loan, owned 5,000 acres in Cass county. He had loaned money and *Page 288 
dealt in real estate in Cass county for forty years. He knew Cass county land, and its value, and he insisted on the payment of the interest and taxes. If the land was so valuable why did he not foreclose? He did not foreclose; he wanted the interest and taxes paid for that would reduce the debt on the mortgage and make a better investment. He had been handling land for forty years but did not offer to buy it or to advance the interest and taxes, and all the witnesses agree that a further loan on the land would have been an over loan. The first time the matter was broached to Brown he turned it down. The second time Baldwin had the Gills in the office he sent for Brown and had him come to the office while the Gills were there, and the deal was made with Baldwin. Baldwin was not trying to help Gill, he was not interested in the Gills creditors, nor was he looking for real estate bargains for Brown. He knew that on account of depression, deflation, the scarcity of money, and the accumulation of two years interest and taxes that his loan was an over loan, and he bent his every effort to secure a deal through which the interest, taxes, and his commission would be paid. The deal with Brown was not only the best deal but apparently the only deal that could have been made under the circumstances and conditions.
We think that the findings of the trial court that the said J.G. Brown paid a good, sufficient, and valuable consideration for the land, and that the reasonable market value for said real estate at the time of the said transfer did not exceed incumbrances past due, taxes, and interest existing against the land, and that its value did not increase during the year 1923, and that the plaintiff and the creditors of Rolland R. Gill and Charlotte Gill, suffered no damage or injury by such conveyance, and that the deed was not executed with any intention to delay, cheat or defraud the creditors, is fully supported by the evidence in the said case, and the judgment is affirmed.
CHRISTIANSON, Ch. J., and BIRDZELL, JOHNSON, and NUESSLE, JJ., concur. *Page 289